# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OHIO
# WESTERN DIVISION

Nicholas Siewertsen,                                    Case No. 3:11CV2572

             Plaintiff

           v.                                              **ORDER**

The Worthington Steel Company,

             Defendant

      This is an employment-discrimination case under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and analogous state-law provisions.

      The plaintiff, Nicholas Siewertsen, is a deaf man who has worked for the defendant, the Worthington Steel Company, since 1999. Among his other duties as a Worthington employee, Siewertsen regularly and without incident operated forklifts, overhead cranes, and other heavy motorized equipment at the company's plant in Delta, Ohio.

      In 2011, however, Siewertsen's supervisors learned – apparently for the first time – of Worthington's corporate policy forbidding deaf employees to operate forklifts. The supervisors immediately barred Siewertsen from operating forklifts and cranes. They also determined, in light of that corporate policy, Siewertsen was ineligible to perform all but four jobs at the Delta plant

      Siewertsen alleges the company's decision to ban him from performing any job requiring him to operate forklifts or cranes constitutes discrimination on the basis of a disability.

      Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367(a).

Pending are the parties' motions for summary judgment (Docs. 76, 79), Siewertsen's motion for leave to withdraw or amend his responses to Worthington's request for admissions (Doc. 86), and Worthington's motion to strike Siewertsen's affidavit supporting his summary-judgment motion (Doc. 87).

For the following reasons, I grant in part and deny in part the motion for leave, deny the motion to strike, and deny the motions for summary judgment.

## Background

Siewertsen has been deaf since birth. Although unable to hear, he can "feel the vibrations of certain noises and sounds." (Doc. 77 at ¶2). Siewertsen's primary form of communication is American Sign Language; he can also read and write English, but he considers it to be like a "foreign" or "second language." (*Id.* at ¶6).

Worthington hired Siewertsen as a part-time worker at its Delta plant in 1999, and on a full-time basis the next year.

The Delta plant is a large steel-processing center. Workers there gather raw steel, galvanize it, and cut it to the specifications Worthington's customers have requested. Once that process is complete, trucks enter the plant to collect the finished steel and deliver it to customers.

Beginning in 2001, Siewertsen worked as a Helper/Packager/Material Handler on the "Pickle Line." (*Id.* at ¶29).

In that position, he operated forklifts, overhead cranes (also called C-hooks), and other motorized equipment on a weekly basis. The company did not train Siewertsen to operate forklifts or cranes, so he learned how to do so from a coworker. Worthington eventually trained Siewertsen,

2

in 2004, to operate forklifts, and the company "recertifi[ed]" him to do so as recently as August, 2010. (*Id.* at ¶¶33-34).

Siewertsen communicated with his coworkers via: 1) a notepad on which he and coworkers would write messages; 2) computer programs like Microsoft Word or Notepad; 3) Microsoft Lync, an instant-messaging program; 4) hand gestures; and 5) limited speech, as his coworkers "understand when [Siewertsen] voice[s] their names or when [he] use[s his] voice to convey simple commands either in person or on the radio." (*Id.* at ¶38).

Worthington also provided Siewertsen with an interpreter during company meetings and at other times, though Siewertsen disputes the extent and efficacy of that accommodation.

## A. Shipper Position

In 2009, Siewertsen transferred into the Shipping Department, where he worked as a Paper Wrapper. (*Id.* at ¶39). Neither party's moving papers explain what exactly a Paper Wrapper does, but Siewertsen characterizes the post as, and the company does not dispute it is, "an entry-level position that requires little skill or experience." (*Id.* at ¶68).

While working as a Paper Wrapper, and as a result of "job creep," Siewertsen soon began performing some duties associated with the Shipper position. (Doc. 80-28 at 51).

Shippers are responsible for loading steel coils onto trucks for outgoing delivery. To accomplish that task, Shippers use forklifts, overhead cranes, lift trucks, and locomotives to retrieve coils from one part of the plant and transport them to another. They also use three-wheeled bicycles to move about the Delta plant.

Shippers must also communicate with the truck drivers who come to the Delta plant to collect the finished steel coils. Roughly one hundred trucks enter the Delta plant per shift, and their drivers,

3

who are not Worthington employees, must work with the Shippers on duty to place the steel coils on their rigs.

Although the Delta plant is large (the size of several football fields, by one estimate), the shipping department is relatively quiet. Employees there do not wear hearing protection, and they communicate with one another orally.

Throughout the plant, the stacking of inventory at various locations creates many line-of-sight obstructions.

For that reason, and because the machinery they operate is quite dangerous, Shippers use audible warning devices while operating forklifts and cranes. (Doc. 79-2 at ¶12). When operating a forklift, a Shipper will honk an attached horn repeatedly when approaching a corner, in the shipping bay, and reversing. Likewise, a Shipper operating the overhead crane will use a buzzer to warn coworkers the machine is in use.

According to Don Gerdes, the Delta plant's Human Resources Manager, a forklift operator "must use his or her hearing to ensure that the horn and other warning sounds are operational in every instance, and to ensure that a warning device sounds every time the forklift goes in reverse." (Doc. 79-2 at ¶12). Gerdes also testified Shippers "must be on constant alert for sounds and audible warnings, such as the C-Hook's buzzing sounds, honks, and yelling, when moving throughout the plant to avoid accidents." (*Id.* at ¶23).

### B. Siewertsen Operates Forklifts and Cranes

From 2009 to mid-January, 2011, Siewertsen operated forklifts and overhead cranes "multiple times per day." (Doc. 77 at ¶43).

4

To compensate for his deafness, Siewertsen followed what he characterized as a strict safety protocol before operating the forklift and crane. He inspected the forklift's flashing lights and emergency brakes to determine if they were in working order. He also honked the forklift's horn to verify it worked: although Siewertsen could not hear the horn, he was able to feel its vibrations.

Siewertsen followed a similar protocol before operating the overhead crane. Due to the placement of the buzzer on that machine, Siewertsen could not feel its vibration or tell whether it was functioning. It was, therefore, his practice to press the buzzer several times at the start of each shift: if his coworkers looked up, Siewertsen inferred the buzzer worked; if not, he would ask a coworker whether the buzzer had sounded.

Siewertsen's safety record is essentially unblemished. He has received multiple awards for outstanding safety performance, and his evaluations consistently show his superiors considered him a responsible, safety-conscious employee. (*Id.* at ¶¶47-52).

In July, 2010, however, Siewertsen was involved in a "near-miss" accident.

A report on the incident explains Siewertsen was emerging from a field of steel coils and "did not stop and look in both directions to see if there was oncoming traffic." (Doc. 80-21 at 1). Consequently, Siewertsen came "within 12 [inches] of being struck by [a] moving forklift." (*Id.*).[1] Worthington did not discipline Siewertsen or require him to undergo any additional safety training.

### C. The No-Deaf-Forklift-Operators Policy

Gerdes testified that, in January, 2011, he learned of "Worthington's corporate-wide policy that deaf employees should not be driving forklifts in its facilities." (Doc. 79-2 at ¶8). The source

---

[1] Siewertsen testified he was a pedestrian when the near-miss occurred, and thus had the right-of-way under Worthington's safety guidelines. The report, however, states Siewertsen was operating a crane.

of this information was Ryan Lamb, Worthington's Regional Health and Safety Manager, who also had not heard of the policy before 2011. (Doc. 76-6 at 4).

## 1. Origins

Documents produced during discovery shed some light on how the policy came to light.

Sometime in December, 2010, or January, 2011, a deaf employee at another Worthington plant requested permission to operate forklifts. The manager of that plant sought guidance from David Hoover, the owner and President of Forklift Training Systems, and David Leff, Worthington's corporate Manager for Health, Safety, and Property.

Hoover was the first to respond. On January 13, 2011, he told the plant manager:

> my opinion has changed on this over the years. OSHA is not the biggest concern, it is keeping people safe and secondly avoiding litigation. I would suggest you not allow a fully deaf person run a forklift at [the plant], the risk to them is too great, you need all your senses to safely run a forklift and not being able to hear is just too much to overcome in a busy plant like yours. If he ran over a contractor that would be terrible and would expose [the plant] to huge liability. As I said, years ago I would have maybe told you something different, but the court cases I have worked as an expert have exposed me to the terrible downsides of what happens when companies make a mistake, even one in good faith

(Doc. 77-38 at 1).

On January 18, Leff issued a "reminder" email "to everybody of what the rule was" – i.e., that deaf employees could not operate forklifts. (Doc. 80-29 at 8).

## 2. Application to Siewertsen

When Lamb received the "reminder" email, he told Leff that Siewertsen had been operating forklifts and cranes at the Delta plant. Lamb also said he and other management personnel "were making some decisions internally" about how to proceed.

Soon thereafter, Lamb, Gerdes, and two managers at the Delta plant – Shipping Traffic Manager Jody Willeman and Plant Operations Manager Jeff Leeper – met "to determine whether the corporate-wide policy should be applied" to Siewertsen. (Doc. 79 at 16). In particular, they "reviewed whether Siewertsen should continue to be operating forklifts," and whether "any accommodations would allow Siewertsen to operate forklifts." (Doc. 79-2 at ¶9).

It does not appear, however, that Lamb, Gerdes, Willeman, or Leeper considered the fact of Siewertsen's past success and experience operating lifts and cranes in deciding whether "the corporate-wide policy should be applied" to him.

To the contrary, Willeman, for one, appeared ignorant of the safety protocols Siewertsen employed at the beginning of his shifts. In an email he sent to Lamb and Leeper on January 19, Willeman acknowledged Siewertsen was able to use the warning devices on the forklifts and cranes, but asked "how does he know they are actually functioning?" (Doc. 76-1 at 5).

In response to that email, Leeper wrote:

> Guys, we will need to discuss this subject very soon and reconsider allowing Nick to drive a lift . . . [H]e is missing an important sense that may help him prevent a serious accident/injury. Example - on foggy days, I will sometimes roll my car windows down to both see AND hear better.
>
> I wish I had given this more thought initially. I absolutely agree with all of Dave Hoover's comments at the very bottom.

(*Id.*).

Based on their review, the Delta plant managers concluded:

- Operating forklifts at the Delta plant "required sufficient hearing and communication skills to provide, hear, and respond to audible sounds and communications";

- The corporate-wide policy should apply at the Delta plant; and

- There were no accommodations that would allow Siewertsen to operate forklifts safely.

(Doc. 79-2 at ¶¶11, 14).

At a meeting on January 20, Lamb told Siewertsen:

Lamb:     This is a discussion currently going on in a Worthington Cylinders plant that we felt we needed to share with you [Lamb shows Siewertsen a copy of Hoover's opinion].

Due to this advice to the WC plant, we are going to re-evaluate our job requirements for forklift and c-hook operators. While we re-evaluate our current job requirements, you will be exclusively working on paper wraps. (No forklift or c-hook).

We will evaluate all positions at WS-Delta to determine the best possible situation for you and the company.

**Rest assured that this does not affect your employment and you will continue to have meaningful work at WS-Delta.**

Please understand that we are looking at this from a safety standpoint, including you, contractors, truck drivers, and your fellow employees.

Siewertsen:     So that mean want me stop operation forklift and c-hook?

Lamb:     Yes, for now (until tomorrow morning at 10) we will have you paperwrapping. We have an interpreter coming in tomorrow to discuss.

We are going to be discussing for the rest of today and tomorrow morning so this doesn't get drawn out, but like it says up top, this doesn't affect your employment at all.

Siewertsen:     Who decision about this?

Lamb:     We're taking the expert's advice into consideration during the discussion. Jeff, Jody and I discussed earlier.

Like I said, we just have to evaluate our requirements for forklift and c-hook, and so until tomorrow at 10 when the interpreter is here, you can work on the paperwraps.

8

Meet here tomorrow at 10a?

(Doc. 77-37 at 1-2) (emphasis in original).

Because Siewertsen could no longer operate forklifts and cranes, his supervisors determined he was eligible to perform only four jobs in the Delta plant. There was an immediate opening for one of the positions, so Worthington transferred Siewertsen to that position without reducing his pay.

The positions from which the company excluded Siewertsen include the Shipper position and the "Pickle Line Process Technician" position. (Doc. 79-2 at ¶¶15-16).

According to Worthington, a Pickle Line Process Technician must have the ability "to engage in immediate communication with employees and . . . move[ ] throughout the plant, which necessitates the ability to both make and hear audible communications for safety reasons." (*Id.* at ¶17).

In late 2011, Worthington awarded the Pickle Line Process Technician slot to an employee named Matt Thourot. Thourot, a Worthington employee since 1997, "had been working in the Wet Lab Tech position in the Delta Plant, which is the traditional progression into the Pickle Line Process Technician problem." (*Id.* at ¶19). Because Thourot had "more experience and training applicable to the Pickle Line Process Technician than Mr. Siewertsen," the company offered the position to Thourot. (*Id.*).

### D. Litigation

In July, 2011, Siewertsen filed a charge of discrimination with the Ohio Civil Rights Commission and the United States Equal Employment Opportunity Commission. He alleged Worthington had discriminated against him on the basis of his deafness with respect to "discipline, promotion and reasonable accommodation."

9

Both agencies declined to take action.

After receiving his right-to-sue letter, Siewertsen brought a two-count complaint under the ADA and O.R.C. §§ 4112.02 and 4112.99.

He alleges Worthington discriminated against him "on the basis of his disability with regards to discipline, promotions and denial of a reasonable accommodation" when it barred him from using forklifts, cranes, and riding sweepers (another type of motorized equipment)). (Doc. 60 at ¶7). Siewertsen also contends Worthington's policy limits him to only four positions at the plant, all of which involve only menial work, and makes it difficult or impossible to obtain promotions.

## Discussion

Siewertsen (Doc. 76) and Worthington (Doc. 79) have both moved for summary judgment.

Each side contends no reasonable jury could find for the other on three issues at the heart of the case, namely, whether:1) Worthington conducted an individualized inquiry in determining Siewertsen could not perform the essential functions of the Shipper and Pickle Line Process Technician positions; 2) hearing and the ability to communicate audibly are essential functions of those positions; and 3) Siewertsen's continued operation of forklifts and cranes constitutes a direct threat to his coworkers' health and safety.[2]

---

[2] Siewertsen also contends Worthington's actions constitute a "continuing violation" of the ADA, because they effectively prevent him from applying to other positions that require employees to operate forklifts, cranes, or other motorized machinery. Siewertsen alleges that, after filing this lawsuit, there were many positions at the Delta plant he would have applied to had the company not imposed the blanket no-deaf-forklift-operators policy.

Worthington contends this litigation is limited only to whether it violated the ADA by barring Siewertsen from the Shipper and Pickle Line Processing Technician positions.

Given my disposition of the parties' summary-judgment motions, I need not resolve this issue now. I do expect, though, to resolve this issue after further briefing.

10

### A. Preliminary Motions

Before I can get to the merits, there are two preliminary matters to address.

### 1. Motion to Strike

First, Worthington has moved to strike the affidavit Siewertsen filed to support his motion for summary judgment. (Doc. 87). The company argues:1) the affidavit is neither signed nor notarized; 2) none of the one hundred and thirty-two exhibits attached to the affidavit is authenticated; 3) the affidavit contradicts Siewertsen's deposition testimony and admissions he made during discovery; and 4) Siewertsen, by means of the affidavit, is improperly trying to amend his complaint by asserting claims for harassment and retaliation.

After Worthington filed this motion, Siewertsen's counsel filed a signed, notarized copy of the eighty-page, three-hundred-paragraph affidavit that properly authenticates the four hundred pages of attached exhibits. (Doc. 93). Counsel also represented Siewertsen is not raising, and does not intend to raise, any claim of retaliation or harassment.

I therefore reject the first, third, and fourth grounds for striking the affidavit.

I also conclude the contradictions between the affidavit and Siewertsen's deposition do not provide grounds to strike the entire affidavit.

The company has identified only two alleged contradictions between the affidavit and the deposition.

The first contradiction concerns whether alleged mistreatment by Siewertsen's coworkers caused him to have panic attacks. Asked at his deposition whether he "believe[d] that [his] panic attacks are caused by [his] employment at Worthington Industries," Siewertsen testified, "I can't answer that." (Doc. 87-1 at 7-8). In his affidavit, however, Siewertsen strongly implied there is a

11

correlation or causal link between how Worthington treated him and the severity of his anxiety and panic attacks.

Whether Siewertsen's panic attacks stem from mistreatment by his coworkers is not relevant to the issues on summary judgment. Rather, it bears, at most, if at all, on Siewertsen's claim for damages.

In any event, I do not see a clear contradiction between the two sources of evidence, such that I should strike paragraph 41 of the affidavit. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 909 (6th Cir. 2006) (explaining sham-affidavit rule).

The question at the deposition, it seems to me, was sufficiently open-ended that Siewertsen may have understood it as a request to speculate as to the medical "cause" of his panic attacks. So understood, Siewertsen's testimony that he could not answer the question makes sense.

That he later implied in the affidavit there is a correlation or a cause-and-effect relationship between his treatment by Worthington and the severity of his panic attacks does not amount to the type of clear, direct contradiction that warrants striking the affidavit.

The second contradiction concerns whether operators of overhead cranes must be able to hear to perform their jobs properly. Because this issue overlaps with Siewertsen's motion for leave to withdraw or amend, I will discuss it in the context of ruling on that motion, *infra*.

### 2. Motion for Leave to Withdraw or Amend

Second, Siewertsen has moved for leave to withdraw or amend an admission he made when responding to Worthington's request for admissions.[3] One of the company's requests asked

---

[3] Siewertsen has also sought to amend his response to the company's request that he admit the Delta plant "does not have designated lanes with visual traffic signals for vehicles driven in the facility." (Doc. 86 at 2). Siewertsen admitted this was the case as of 2011 and earlier, but his motion

Siewertsen to "[a]dmit that operators of the C Hook must be able to hear audible sounds in order to avoid injuries to others." (Doc. 89-1 at 8). Siewertsen's response was "Admit." (*Id.*).

Siewertsen contends his response was a mistake due to an error in translation between him and his nonlawyer interpreter. In an affidavit he submitted with the motion, Siewertsen explained:

> I understood the Admission to mean that as the operator of the crane/C Hook, I am supposed to use the horn to make audible sounds to alert my coworkers that the crane/C Hook is in use in order to avoid injuries to my coworkers.

(Doc. 86-1 at ¶3).

Siewertsen also observes that whether hearing is necessary to operate the cranes safely is one of the central disputed factual questions in the case. And given that Siewertsen safely operated cranes for years despite being deaf, he argues it would make no sense for him to admit he could not operate the machines without the ability to hear.

Worthington opposes the motion, arguing: 1) it would suffer prejudice because it has relied on Siewertsen's admission in litigating the case; and 2) permitting Siewertsen to change his response would necessitate further discovery and cause additional delays in resolving the case.

Fed. R. Civ. P. 36(b) provides "the court may permit withdrawal or amendment" of an admission if doing so "would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits."

---

observes that Worthington "has now created pedestrian walkways and instituted the use of warning lights." Siewertsen's original answer ("Admit") will stand, and I will bear in mind conditions at the plant have changed since 2011. I make no ruling herein as to the admissibility as to changes in the pathway markings and other employee-protective measures.

The rule is "intended to facilitate proof at trial by obviating the need to adduce testimony or documents as to matters that are really not in controversy." *U.S. v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009). A district court "has considerable discretion over whether to permit withdrawal or amendment of admissions." *Buckeye Cablevision, Inc. v. Augustniak*, 2005 WL 1223805, *2 (N.D. Ohio) (Armstrong, J.).

In the exercise of my discretion, I will permit Siewertsen to withdraw this admission.

I do so principally because, given the nature of Siewertsen's claims, it would be inexplicable for him to admit, as the result of a sincere belief and accurate appraisal of the facts, operators of the overhead crane must be able to hear to perform that job safely.

While Siewertsen's interpretation of what Worthington was asking for in its request for admission may seem tortured, there is no record of the exchange between Siewertsen and his interpreter when they discussed that request. Siewertsen has testified, moreover, American Sign Language is not grounded in the English language, and thus that English is like a second language to him. It may be, then, that an error in translation is responsible for Siewertsen's admission – an admission that is contrary to Siewertsen's own theory of the case. In a word, I decline to penalize Siewertsen (and the penalty might be substantial *vis-a-vis* his ADA claim) where what, from all that I can tell, in the words of Paul Newman in *Cool Hand Luke*, "we've got here is a failure to communicate."

To remedy any prejudice Worthington may incur from this decision, it may take such reasonable additional discovery as is necessary to that end.

Accordingly, I grant in part and deny in part Siewertsen's motion for leave to amend.

**B. Summary Judgment**

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

**1. ADA Requirements**

"The ADA makes it unlawful for an employer to 'discriminate against a qualified individual on the basis of a disability.'" *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) (quoting 42 U.S.C. § 12112(a)). An employer must provide reasonable accommodations for the known limitations of an otherwise qualified employee with a disability, unless doing so would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A).

To prevail on an ADA claim, Siewertsen must prove: 1) he has a disability; 2) he is otherwise qualified for the position; and 3) Worthington excluded him from the position because of his disability. *Jordan v. Greater Dayton Premier Mgmt.*, 9 F. Supp. 3d 847, 856 (S.D. Ohio 2014).[4]

---

[4] Because the Ohio courts follow federal law when resolving disability-discrimination claims under O.R.C. § 4112.02, I need not discuss Siewertsen's state-law claim separately. *Bloomfield v. Whirlpool Corp.*, 984 F. Supp. 2d 771, 776 (N.D. Ohio 2013) (Helmick, J.).

There is no dispute Siewertsen is disabled, or that Worthington took the adverse employment action solely because Siewertsen is deaf. The parties dispute Siewertsen's qualifications for the Shipper and Pickle Line Processing Technician positions, and how Worthington determined he could not work in those positions.

### 2. Individualized Inquiry

"The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000).

"A proper evaluation involves consideration of the applicant's personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job in question." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). "This follows from the ADA's underlying objective: 'people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have." *Id.* (quoting *Holiday*, *supra*, 206 F.3d at 643).

At bottom, the individualized inquiry requires the employer to consider whether the employee, despite his disability, is capable of performing the essential functions of the job.

Siewertsen argues Worthington failed to undertake an individualized inquiry.

According to Siewertsen, the undisputed evidence shows the managers and supervisors at the Delta plant relied, not on an individualized assessment of his ability to operate forklifts and overhead cranes, but on the company's blanket policy forbidding deaf employees to operate forklifts or cranes.

16

He also emphasizes that he operated fork lifts and cranes for several years without incident. Nevertheless, Siewertsen contends, neither Lamb, Gerdes, Willeman, nor Leeper ever asked Siewertsen about those experiences or allowed him to demonstrate his proficiency on a forklift or crane.

Finally, Siewertsen contends there is no evidence in the record that any of the Delta plant managers took Siewertsen's past experiences operating heavy mechanized equipment into account when deciding whether to apply the company's policy against deaf forklift drivers in his case.

Worthington responds it fulfilled its obligations under the ADA when "four management employees . . . reviewed whether Siewertsen could operate forklifts and reviewed which positions in the plant he could perform with or without accommodation." (Doc. 85 at 22).

I conclude, contrary to both parties' positions, that reasonable minds could differ as to whether Worthington engaged in a truly individualized determination.

Siewertsen has adduced ample evidence to show the company failed to do so.

Most significantly, Siewertsen testified without contradiction no one from the Delta plant asked him about his past experiences operating forklifts and cranes before the company forbade him to operate those machines. Nor is there are any evidence the Delta plant supervisors spoke to coworkers to learn how Siewertsen managed to operate those machines without incident. Indeed, the record suggests the managers were entirely ignorant of the safety protocols Siewertsen went through before operating a forklift or crane.

Whether Siewertsen's work history, and the safety protocols in which he engaged, suffice to show Siewertsen can safely operate lifts and cranes is, for present purposes, beside the point.

But the fact that the company apparently failed to consider that evidence at all in reviewing Siewertsen's fitness for the Shipper position, and others, is considerable evidence the company failed to engage in an individualized determination. *Keith*, *supra*, 703 F.3d at 924 (no individualized determination where employer's doctor "made no effort to determine whether, despite his deafness, Keith could perform the essential functions of the position"); *Holiday*, *supra*, 206 F.3d at 644 (no individualized determination where doctor disqualified HIV-positive plaintiff from being a police officer without "attempt[ing] to determine whether Holiday actually experienced . . . symptoms of physical weakness or lack of endurance"); *Backhaus v. General Motors LLC*, 54 F. Supp. 3d 741, 749 (E.D. Mich. 2014) ("past work experiences of the disabled individual must be considered" by employer when conducting individualized inquiry).

At the same time, there is sufficient evidence – though perhaps just barely – to support a reasonable finding that Worthington performed the required inquiry.

Lamb, Gerdes, Willeman, and Leeper each testified they considered whether Siewertsen, as a deaf employee, could safely operate forklifts and cranes in the plant. They also considered whether there were any accommodations the company could make that would enable Siewertsen, despite his deafness, safely to perform the essential functions of the positions.

Accepted as true, and viewed in the light most favorable to Worthington, this evidence could persuade a jury that Worthington conducted an individualized inquiry when it limited Siewertsen's job opportunities at the Delta plant.

On its face, the testimony establishes Worthington management acknowledged Siewertsen's disability and considered whether it would impede his effective performance of the essential functions of the available position. While it appears the managers may not have given adequate

18

consideration to Siewertsen's past operation of forklifts and cranes, that omission, a reasonable jury could find, only affects the rigor of their individualized inquiry, and does not show the managers failed adequately within the framework of the ADA, to undertake such an inquiry in the first place.

For these reasons, summary judgment is unwarranted on the individualized-inquiry issue.

### 3. Otherwise Qualified

A disabled employee is "otherwise qualified" for a position if he can perform the essential functions of the job in question, with or without a reasonable accommodation. 42 U.S.C. § 12111(8).

### a. Essential Functions of the Shipper and Pickle Line Processing Technician Positions

"Essential functions are 'the fundamental job duties of the employment position the individual with a disability holds or desires.'" *Rorrer*, *supra*, 743 F.3d at 1039 (quoting 29 C.F.R. § 1630.2(n)(1)).

"Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." *Id.* (internal quotation marks omitted). Relevant factors include: "(1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs." *Keith*, *supra*, 703 F.3d at 925-26 (citing 29 C.F.R. § 1630.2(n)(3)).

Whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Id.* at 926.

The duties and functions of the Shipper and Pickle Line Processing Technician positions are not in dispute.

19

Those workers need to operate forklifts, overhead cranes, and other sizable mechanical equipment safely and on a regular basis. They must also move throughout the plant and communicate with their fellow employees and the many non-employee truck drivers who enter the plant to retrieve inventory. Finally, Pickle Line Processing Technicians must be able to "engage in immediate communication with employees." (Doc. 79-2 at ¶17).

What is disputed is whether workers must be able to hear and communicate audibly to perform these jobs.

Worthington contends employees in both positions must be able to communicate audibly, hear the audible communications of their coworkers, and respond appropriately to such audible communication.

To support this claim, the company points to testimony from two long-time Shippers, Mark Zellers and David Dunham, that communicating audibly was an integral part of their job. (Doc. 79-3 at 15-17; Doc. 79-4 at 14-15). Worthington also points to Gerdes's declaration that it is necessary for forklift operators to hear whether the forklift's horn and other warning devices are operating, "and to ensure that a warning device sounds every time the forklift goes in reverse." (Doc. 79-2 at ¶12).

Siewertsen concedes the ability to communicate is an essential function of both positions, but denies that being able to hear is a *sine qua non* of safe and efficient communication, and thus "essential" within the meaning of the ADA.

He notes that, at the time Worthington barred him from operating forklifts, there was no written job description listing hearing or audible communication as an essential function. He also emphasizes he performed key duties of the Shipper and Pickle Line Processing Technician positions

20

– forklift operation, crane use, and moving throughout the plant – for several years, all without incident or injury. Finally, Siewertsen testified he requested a badge indicating he was deaf to improve his communication with the outside truck drivers who enter the Delta plant.

A reasonable jury could reach different conclusions as to whether the totality of this evidence establishes the abilities to communicate audibly, and to hear the audible communications of others, are truly essential job functions.

Worthington's moving papers do not acknowledge – let alone dispute – the evidence that Siewertsen, in spite of his deafness, safely and successfully operated forklifts and overhead cranes at the Delta plant. Moreover, Siewertsen has been working in the Delta plant since 2000 and has never, so far as the record before me shows, sustained or caused an injury from a piece of heavy equipment due to his inability to hear.

This unchallenged evidence supports, at a minimum, a fair inference that hearing and the ability to communicate audibly are not essential functions of the Shipper or Pickle Line Processing Technician positions. *Keith*, *supra*, 703 F.3d at 926-27 (deaf employee's passing of lifeguard-certification training program, among other evidence, created factual dispute as to whether hearing was essential function of being a lifeguard); *Holiday*, *supra*, 206 F.3d at 644-45 (plaintiff's past service as police officer while HIV-positive tended to show he was qualified to perform essential functions of that job); *Backhaus*, *supra*, 54 F. Supp. 3d at 750 ("Backhaus's work experience driving forklifts creates a question of fact as to whether he capable of performing the essential functions of a forklift driver.").

Siewertsen has also introduced expert testimony from Robert Burch, an expert on the construction industry, accident investigations, and environmental health and safety.

21

Based on his background, training, and experience, Burch opined "[t]he essential requirement for both forklifts and overhead cranes, aside from physical ability, is vision, the ability to see the equipment components, surrounding area, direction of travel and potential hazards, including pedestrians." (Doc. 80-46 at 5-6). Burch accordingly concluded "Siewertsen is very qualified to operate a forklift, overhead crane, tow motor and any other powered industrial vehicle." (*Id.* at 6).

This testimony tends to bolster Siewertsen's contention he is qualified to perform the essential functions of the Shipper and Pickle Line Process Technician positions. *Cf. Keith*, *supra*, 703 F.3d at 927 (expert testimony that deaf plaintiff was qualified to be lifeguard supported plaintiff's claim he could perform essential functions of the position).

At the same time, Worthington's evidence – and some deficiencies in Siewertsen's – would support a jury finding that hearing and audible communication are essential job functions.

The testimony from Dunham and Zellers, the two long-time Shippers, suggests that hearing is not merely an extrinsic attribute of the Shipper position, but a valuable and, perhaps, necessary attribute for that position.

Both of the Shippers testified noise levels in the shipping department are low; consequently, the Shippers do not wear any hearing protection and are able to communicate orally. Moreover, Zellers and Dunham testified there were many obstructed site lines in the plant, thereby triggering the need for forklift drivers and crane operators to sound audible warnings.

Siewertsen, of course, is capable of sounding those warnings when he is operating either machine. But Zellers's and Dunham's testimony underscores the risk Siewertsen faces himself – and thus one of the grounds on which Worthington disqualified him from the Shipper position – because he is unable to hear audible warnings.

22

Furthermore, Worthington has introduced evidence from its own expert, Dave Hoover, showing forklift operators must be able to hear to do their jobs safely. Hoover, who has trained thousands of people to operate forklifts, opined Siewertsen's deafness put him at a "tremendous disadvantage in terms of [his] safety and the safety of others." (Doc. 76-16 at 5). "No matter how hard [Siewertsen] tries to compensate visually," Hoover explained, he "cannot overcome the fact [he] can't hear what is going on around [him]." (*Id.* at 6).

Finally, Siewertsen's moving papers do not, despite their great length, meaningfully address his ability to communicate with the non-employee truck drivers who arrive at the Delta plant to collect finished steel coils.

These truck drivers, not being Worthington employees, may not expect to encounter a deaf employee on their arrival at the Delta plant. A reasonable jury could conclude that, with more than one hundred trucks entering the plant during each shift, any miscommunications between the truck drivers and Siewertsen could impede the efficient loading and unloading of Worthington's inventory.

Although Siewertsen apparently had a badge identifying him as deaf, there is scant evidence – other than Siewertsen's conclusory testimony – illuminating how Siewertsen communicated with the truck drivers.

A reasonable jury could, therefore, view this evidence as supporting Worthington's claim audible communication is an essential function of the Shipper position.

For all these reasons, a jury must decide whether hearing and the ability to communicate audibly are essential job functions of the Shipper and Pickle Line Processing Technician positions.

### b. With or Without a Reasonable Accommodation

To establish a claim of failure to accommodate, the plaintiff "must present evidence that he requested and was denied a reasonable accommodation." *Backhaus*, *supra*, 54 F. Supp. 3d at 752.

"To provide a reasonable accommodation, an employer may be required to modify the responsibilities of disabled employee's existing job or transfer the employee to a vacant position with different responsibilities." *Rorrer*, *supra*, 743 F.3d at 1039 (citing 29 C.F.R. § 1630.2(*o*)). But "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000).

### i. Failure to Request an Accommodation

Worthington contends Siewertsen's claim fails because he never requested any accommodation. Siewertsen counters that once the company barred him, on account of his deafness, from performing all but four positions in the plant, it would have been futile to request the company accommodate his deafness.

The ADA imposes liability on an employer's failure to accommodate an employee's "known physical or mental limitations." 42 U.S.C. §12112(b)(5)(A). Consequently, "[a] plaintiff must explicitly request an accommodation, unless the employer otherwise knew that one was needed." *Jones v. Nationwide Life Ins.*, 696 F.3d 78, 89 (1st Cir. 2012).

It is undisputed Worthington both knew of Siewertsen's deafness and considered whether there were any accommodations permitting him to operate forklifts and cranes. In these circumstances, Siewertsen's failure to request a specific accommodation does not bar his failure-to-accommodate claim. *Cf. Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004) ("when

a request would be futile, we have excused the failure to make it when the need for an accommodation was obvious to the employer").

### ii. Without an Accommodation

As my discussion, *supra*, shows, there is a material factual dispute as to whether Siewertsen is qualified to perform the essential functions of the Shipper and Pickle Line Process Technicians without an accommodation.

The evidence viewed in the light most favorable to Siewertsen tends to show he can, and did, perform key duties of the Shipper position safely and regularly despite his deafness. That same evidence also tends to show hearing and audible communication are not essential functions of that position. Accordingly, there is sufficient evidence for a jury to find Siewertsen was otherwise qualified without any accommodation.

### iii. With a Reasonable Accommodation

Disputed questions of material fact also remain as to whether, assuming hearing and audible communications are essential job functions, Siewertsen could have worked as a Shipper or Pickle Line Process Technician with an accommodation.

Indeed, the fact that Siewertsen operated lifts and cranes in the past is probative evidence Worthington could have accommodated his disability. *E.E.O.C. v. Hibbing Taconite Co.*, 720 F. Supp. 2d 1073, 1080 (D. Minn. 2010) ("The very fact that [the deaf plaintiff] successfully worked at [a different] mine pit is strong evidence that a reasonable accommodation [at defendant's mine pit] could have been possible.").

Moreover, Siewertsen has identified a number of other accommodations – affixing blue LED lights that light up the floor when a forklift is in reverse, creating designated lanes in the plant for

25

forklift and pedestrian traffic, and adding convex mirrors at intersections – that do not appear unreasonable on their face.

Whether these or other accommodations are, in fact, reasonable, and whether they would enable Siewertsen to perform the essential functions of the Shipper and Pickle Line Process Technician position, will be for the jury to decide.

### 4. Direct Threat to the Safety of Others

A disabled employee is not "otherwise qualified" for a job if he poses a "direct threat" to the health or safety of others that a reasonable accommodation cannot eliminate. 42 U.S.C. § 12111(3).

"The direct threat defense must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (internal quotation marks omitted).

"[A]n employer can not disqualify an applicant simply because of a slightly increased risk of harm." *Backhaus*, *supra*, 54 F. Supp. 3d at 751. "The risk must be highly probable and the harm must be substantial." *Id.*

Four factors are relevant to the direct-threat defense: "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." *Backhaus*, *supra*, 54 F. Supp. 3d at 751 (citing 29 C.F.R. § 1630.2(r)).

Worthington contends Siewertsen's "deafness and inability to orally communicate would invite undue risk to himself and others in the Delta Plant if he were to move throughout the plant in

26

Shipper or Pickle Line Process Technician positions." (Doc. 79 at 25). Given the heavy equipment and the need to move around the plant, Worthington asserts the employees "are inviting physical harm or even death if they cannot provide and respond to audible sounds and warnings." (*Id.*).

Siewertsen strongly disputes the company's contentions, citing his history of safely moving through the plant and operating heavy equipment.

Once again, I conclude that a material factual dispute precludes summary judgment.

Worthington's defense is predicated on the same disputed factual contentions as its arguments that Siewertsen is not qualified, given his deafness, to work as a Shipper or Pickle Line Processing Technician. As summary judgment is not appropriate on those issues, so too it is inappropriate on the company's affirmative defense. *Cf. Hibbing Taconite*, *supra*, 720 F. Supp. 2d at 1082-83 ("As discussed in detail above, there is a genuine issue of material fact regarding [plaintiff's] ability to communicate when accommodated, thereby eliminating the alleged danger created by his disability.").

Moreover, the testimony of Siewertsen's supervisors does not establish, as a matter of law, there is "high probability of substantial harm." 29 C.F.R. § 1630.2(r). Rather, Willeman testified Siewertsen was only "somewhat at risk" of injuring a coworker (Doc. 80-10 at 43), whereas Lamb opined Siewertsen had only "a higher potential" for an accident than "an operator with – with proper hearing." (Doc. 80-23 at 55).

Finally, both Lamb and Hoover rejected the idea that Siewertsen posed an "imminent" risk of inflicting or sustaining an injury while operating a forklift. (Doc. 80-23 at 57-58; Doc. 80-35 at 56).

In light of this evidence, summary judgment is not warranted.

**Conclusion**

It is, therefore,

ORDERED THAT:

1.      Worthington's motion to strike (Doc. 87) be, and the same hereby is, denied;

2.      Siewertsen's motion for leave to withdraw or amend (Doc. 86) be, and the same

        hereby is, granted in part and denied in part; and

3.      The parties' motions for summary judgment (Docs. 76, 79) be, and the same hereby

        are, denied in their entirety.

The Clerk shall forthwith set this case for a status conference.

So ordered.

<u>/s/ James G. Carr</u>
Senior U.S. District Judge