IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Nicholas Siewertsen,                            Case No. 3:11 CV 2572

                Plaintiff,            MEMORANDUM OPINION
                                            AND ORDER

       -vs-                                  JUDGE ZOUHARY

Worthington Industries, Inc.,

                Defendant.

## INTRODUCTION

Plaintiff Nicholas Siewertsen sued Defendant Worthington Industries for employment discrimination under the Americans with Disabilities Act (ADA) and Ohio law. Siewertsen, who is deaf, claims Worthington unlawfully discriminated against him by prohibiting him from operating forklifts, cranes, and other motorized equipment in the plant, and by reassigning him to an entry-level position. Following a four-day trial on liability, the jury returned a verdict in favor of Siewertsen (Doc. 135). The jury later heard evidence on the question of damages, but the parties entered a stipulation on the amount of damages before the jury reached a verdict (Doc. 178). Pending before this Court are Worthington's Motion for a New Trial (Doc. 192) and Motion for Judgment as a Matter of Law (Doc. 193). Both Motions are fully briefed (Docs. 212, 219, 224, 233, 240), and this Court addresses them in reverse order below.

## STANDARD OF REVIEW

Federal Civil Rule 50 provides that judgment as a matter of law may be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). In deciding a motion under Rule 50, this Court may not weigh the credibility of the

witnesses or substitute its judgment for that of the jury. *United States v. Alpine Indus., Inc.*, 352 F.3d 1017, 1022 (6th Cir. 2003). This Court may grant the motion "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001).

The application of Federal Civil Rule 59(a) is similarly limited. While this Court "must compare the opposing proofs, weigh the evidence, and set aside the verdict if it . . . is against the clear weight of the evidence," this Court cannot set aside the jury verdict "simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991). This Court may grant a new trial for a variety of reasons, including "if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 629, 637 (6th Cir. 2000); *see also Holmes v. City of Massilon*, 78 F.3d 1041, 1045 (6th Cir. 1996) ("[A] new trial is warranted when a jury has reached a 'seriously erroneous result' . . . .") (citation omitted). Of course, the burden of demonstrating the necessity for a new trial is on the moving party, and the decision whether to grant such relief is vested within the sound discretion of this Court. *Clarksville-Montgomery Cty. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991). While district courts have "a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached." *Conte*, 215 F.3d at 637 (quoting *Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984)).

**DISCUSSION**

**Motion for Judgment as a Matter of Law**

Before trial, the parties stipulated that Siewertsen has a disability within the meaning of the ADA. Thus, to prevail on his discrimination claim, Siewertsen was required to prove by a preponderance of the evidence that (a) he was qualified for the position of Shipper, and (b) he suffered an adverse employment action because of his disability. At trial, Worthington raised a "direct threat" defense, arguing that even if Siewertsen were otherwise qualified to perform the Shipper position, allowing him to do so would pose an imminent risk of serious harm to himself and others.

*Qualified Individual*. Worthington first argues that Siewertsen was not a "qualified individual" under the ADA because he could not perform the essential functions of the Shipper position. Citing both the "physical demands form" and the factory safety rules, Worthington contends the ability to audibly communicate is an essential job function for employees working in the Shipping Department. Specifically, Worthington notes that its safety rules require employees to sound horns and other audible warning devices while operating forklifts and C-hooks. Pedestrians in the coil field also rely on these signals to maintain safety around blind spots. Worthington maintains that it would be "physically impossible" for Siewertsen to comply with these safety standards without an accommodation -- such as requiring forklift drivers to stop at intersections and blind spots. Worthington notes that Siewertsen did not request an accommodation, and, in any event, this proposed change in policy would be unworkable.

The jury, however, had a legally sufficient evidentiary basis to conclude that Siewertsen was able to perform the essential functions of the Shipper position without accommodation. Perhaps the strongest evidence in Siewertsen's favor is his past work experience. The jury heard testimony that

3

Siewertsen had operated forklifts and other machinery for ten years without any accidents, and he was recertified on the forklift in 2010, just months before Worthington's decision to reassign him. Siewertsen also presented expert testimony that while communication is essential to the safe operation of heavy machinery like forklifts and C-hooks, such communication does not necessarily have to be audible. Moreover, the jury heard testimony describing how Siewertsen compensated for his inability to hear by using his other senses. Siewertsen also correctly notes that his expert did not recommend that forklift drivers stop at intersections and blind spots as an accommodation for his deafness; rather, he offered this testimony as a general opinion about best safety practices. Based on this evidence, a reasonable jury could conclude that the ability to communicate audibly is not an essential function of the Shipper position, and Siewertsen therefore was qualified to perform the job.

*Adverse Employment Action.* Worthington next argues that Siewertsen failed to prove he was subject to an adverse employment action. Worthington notes that Siewertsen remains employed with the company, has never had his pay reduced, and was awarded no damages for "back pay," including alleged lost overtime and profit sharing (*see* Doc. 203 at 128–30). Citing ADA regulations, Worthington characterizes Siewertsen's transfer to an entry-level position on the Pickle Line as a reasonable accommodation in light of his disability.

As an initial matter, Siewertsen argues that he should not have been required to prove an adverse employment action because his claims were based on direct evidence of discrimination (Doc. 212 at 15–16, n.2). While Siewertsen perhaps could have -- and at various points in the litigation, did -- present his claims as a direct evidence case (*see, e.g.*, Doc. 76 at 20), he did not object to the Jury Instructions regarding the elements of disability discrimination and the definition of adverse employment action (*see* Doc. 133 at 7; Doc. 133-1 at 7–9; Doc. 149 at 64–65), and this Court included

4

several edits to those instructions requested by his counsel (*id.*). Further, Siewertsen testified that he believed he suffered an adverse employment action (*e.g.*, Doc. 147 at 149–50), and his counsel also addressed the nature of those allegations in some detail in her opening and closing statements (Doc. 147 at 22; Doc. 149 at 91–92). Siewertsen therefore has waived this objection. *See Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*, 9 F.3d 422, 427 (6th Cir. 1993) ("This circuit requires that a formal objection be made before and after the jury instructions are given, unless 'it is plainly apparent from the discussion between the parties and the judge that the judge was aware of a party's dissatisfaction with the instruction, as read to the jury, and the specific basis for that claimed error or omission.'") (quoting *Woodbridge v. Dahlberg*, 954 F.2d 1231, 1237 (6th Cir. 1992)).

Nevertheless, Siewertsen presented evidence sufficient for the jury to find he suffered an adverse employment action. For example, Siewertsen testified that his reassignment to the Pickle Line resulted in reduced job responsibilities and prestige. He also testified that his opportunities for advancement were more limited, and his potential for future pay raises was capped. A reasonable jury could conclude these were "materially adverse change[s] in the terms and conditions" of employment. *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004); *Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir. 2006) ("[A]n employee need not have suffered one of the 'ultimate employment actions' listed above (e.g. termination, demotion, failure to promote, etc.) to have a viable claim of discrimination. A material adverse action may consist of a less distinguished title, diminished options for advancement, or other unique indices.").

*Direct Threat*. Finally, Worthington argues Siewertsen failed to rebut its direct threat defense. Worthington notes it is undisputed that the coil field is a "very dangerous" work environment, and Worthington's expert testified that it was "very likely" that Siewertsen would be injured or cause

5

injury if permitted to work in the coil field -- either by operating forklifts or other machinery, or on foot. But to determine whether an employee poses a direct threat, an employer must conduct an individualized inquiry into the employee's "personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job in question." *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013) ("This follows from the ADA's underlying objective: 'people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged on the relevant medical evidence and the abilities they have.'") (quoting *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000)).

Worthington however failed to conduct the requisite individualized inquiry, instead reassigning him based on the recommendation of an expert who opined that deaf individuals should not operate forklifts. Worthington's expert did not meet with Siewertsen or review his medical or personnel records before issuing this recommendation. Siewertsen also presented evidence countering Worthington's position on the likelihood or immediacy of any potential threat, such as his 2010 recertification to operate forklifts, his overall safety record, and his performance evaluations. This evidence was sufficient for a jury to find that Worthington failed to prove its direct threat defense.

**Motion for a New Trial**

Worthington identifies three grounds which it contends merit granting a new trial. First, Worthington contends it was prejudiced by the introduction of improper testimony by Siewertsen's expert, Robert Burch. Second, Worthington claims the Court interpreters were biased in their translation of Siewertsen's testimony from American Sign Language (ASL) to spoken English.

Finally, Worthington contends the jury verdict was unreasonable because it was against the clear weight of the evidence.

*Expert Testimony.* Worthington first argues it is entitled to a new trial because Burch's expert testimony was irrelevant, misleading, and prejudicial. Worthington specifically contends Burch was not qualified to offer an expert opinion in this case because his review of the Delta plant was not sufficiently thorough. Worthington also takes issue with Burch's opinion that forklifts should be required to stop at intersections, which contradicted Siewertsen's position that he was not seeking an accommodation, thus misleading the jury.

Worthington's first argument confuses the admissibility of expert testimony with how much weight should be given to that testimony. Burch testified that he based his opinion on his review of Siewertsen's job duties, training records, recertifications, evaluations, Worthington employee manuals, and other documents. He also conducted a site visit, during which he toured the Shipping Department and observed the operation of forklifts and other motorized equipment at the plant. Worthington cites no authority suggesting this review was an insufficient basis for an expert opinion. Instead, it contends Burch's testimony was improper because he admitted he should have conducted a week-long plant audit, but did not. In fact, Burch testified that he would have conducted an audit if he had been hired to review Worthington's policies, procedures, and training related to forklifts, generally (Doc. 80-34 at 23; Doc. 147 at 71–72). He also testified that the scope of his opinion in this case was much narrower and was limited to whether Siewertsen, specifically, could safely operate a forklift (Doc. 147 at 51, 72).

Likewise, Burch did not testify that Siewertsen required an accommodation to safely operate motorized equipment in the Delta plant. Rather, he opined that *all* forklift operators should stop at

7

intersections (Doc. 147 at 102). Burch offered a similar, general opinion about operating C-hooks in an environment with forklifts, trucks, and pedestrians (Doc. 147 at 104) ("[I]f you have employees walking doing that operation and forklifts operating in that same area where employees have to concentrate, I don't care if they can hear or not, that is really dangerous. And you better change something, number one."). Offering an opinion on best practices for plant safety does not necessarily equate to advocating for an accommodation. Burch's testimony is not inconsistent with Siewertsen's position that he did not require an accommodation to perform the Shipper position.

*Interpreters.* Worthington next argues that issues related to the sign language interpretation at trial introduced unfair bias into the proceedings. Worthington identifies three such problems. First, Worthington contends that Michelle Doyle, one of the Court interpreters, suffered from a conflict of interest that impermissibly biased her interpretation in favor of Siewertsen's view of the case. As discussed at length on the record, in the parties' briefing, and in this Court's prior Orders (*see* Doc. 191 at 13–29; Docs. 234, 235, 239), Doyle and Siewertsen's counsel promptly notified this Court when they recognized each other on the morning of trial. Doyle and counsel determined that Doyle had provided interpretation services for an attorney-client meeting relatively early on in the case, in May 2014. As this Court explained in an earlier Order (Doc. 239), Doyle has consistently and repeatedly testified that she does not recall the details of what was discussed during that meeting. While it is always preferable to avoid even the appearance of a conflict of interest, this Court finds no basis for concluding that Doyle's prior contact with Siewertsen and his counsel prevented her from interpreting the proceedings in an objective, impartial manner.

Second, Worthington objects to communications before and during the trial between Janet Dobecki, Siewertsen's table interpreter, and the Court interpreters. Worthington asserts that Dobecki

8

interfered with the impartial translation of Siewertsen's testimony by (1) participating in the Court interpreters' pre-trial language assessment with Siewertsen, (2) providing the Court interpreters with a list of signs specific to Siewertsen's use of language and the vocabulary of this case, and (3) "correcting" the record testimony when the Court interpreters missed or misunderstood a sign.

The extent to which Dobecki participated in the language assessment is unclear. For example, Dobecki testified she merely observed the assessment (Doc. 230 at 4), while Doyle described a "discussion" including Dobecki, Siewertsen, and Peter Parsons, the other Court interpreter (Doc. 228 at 16, 36). Nevertheless, both Doyle and Parsons testified that they did not discuss Siewertsen's claims or theory of the case with Siewertsen or Dobecki (*see* Doc. 228 at 26; Doc. 229 at 7). Moreover, the language assessment took place in open court, while counsel for both sides -- as well as Chambers staff -- prepared for the start of voir dire. Regardless of whether they understood the exact nature of the meeting, defense counsel did not object to Siewertsen and Dobecki communicating with Doyle and Parsons at the time. While it would have been more prudent for the Court interpreters to seek agreement of counsel or Court approval of the attendance list before conducting the language assessment, this Court finds no reason to believe Dobecki's presence improperly influenced their interpretation of trial proceedings.

The same conclusion holds true for the list of signs Dobecki prepared for the Court interpreters. As this Court previously noted (Doc. 187 at 21), the better course of action would have been for Dobecki to provide this document to counsel and this Court for review and approval. Nevertheless, in light of Doyle, Parsons, and Dobecki's explanations of the meaning of both the typewritten items on the list and the handwritten notes, as well as how they were used to aid in the

interpretation at trial (Doc. 187 at 18, 25; Doc. 228 at 18–26; Doc. 229 at 10–17), this Court finds no evidence of bias against Worthington.

As for Dobecki's "corrections" to the Court interpreters' translations, the National Consortium of Interpreter Education Centers – Legal Interpreting Workgroup's best practices advise that one of the responsibilities of a table interpreter is to "observe the interpretation provided by the Proceedings Interpreters to monitor the accuracy and effectiveness of the interpretation." National Consortium of Interpreter Education Centers, *Best Practices: American Sign Language and English Interpretation Within Legal Settings*, at 26 (2009). Doyle and Parsons both testified that they interpreted the trial proceedings to the best of their abilities, without "favoritism" to Siewertsen, and that Dobecki did not influence their interpretation beyond providing assistance with unfamiliar signs (Doc. 187 at 23, 25–27; Doc. 228 at 36, 38). Once again, a clearer record on this issue -- for example, raising objections to the interpretation through counsel, or at least clearly identifying the source of the correction at the time it was made -- would have avoided any appearance of impropriety. But Worthington has now thoroughly cross-examined Doyle and Parsons on the nature and extent of Dobecki's involvement with their translation services at trial, and this Court finds no reason to believe Worthington was unfairly prejudiced.

Finally, Worthington contends that by employing the consecutive method of interpretation, the Court interpreters did not translate Siewertsen's testimony verbatim. Instead, they took notes of certain key words while Siewertsen signed, then relied on those notes and their memories to translate his testimony into English. Worthington suggests that this translation method required the interpreters to "expound on" or "fill in" gaps in their notes when voicing Siewertsen's testimony in English.

Worthington's characterization is contradicted by the testimony of the interpreters. Consecutive interpretation is considered best practice in trial settings because it is more accurate and requires fewer interruptions to the natural flow of the witness's speech. *Best Practices*, at 14. Doyle testified that she did not merely jot down "key terms" from Siewertsen's testimony, but rather took shorthand notes "to ensure that all of the information is interpreted" (Doc. 228 at 11). Parsons also explained that, given the differences in grammatical structure between American Sign Language and spoken English, no effective interpretation will be word-for-word (Doc. 229 at 18). This is equally true of translations between voiced languages, and regardless of whether the translation is simultaneous or consecutive. *See* National Association of Judiciary Interpreters & Translators, *Frequently Asked Questions* (available at https://najit.org/resources/the-profession/#faq) ("Some judges and attorneys have a mistaken belief that an interpreter renders court proceedings word for word, but this is impossible since there is not a one-to-one correspondence between words or concepts in different languages. . . . Rather than word for word, interpreters render meaning by reproducing the full content of the ideas being expressed. Interpreters do not interpret words; they interpret concepts.").

Notably, Worthington does not claim that the Court interpreters were unqualified or insufficiently trained in using consecutive interpretation. Nor does Worthington cite any authority suggesting that consecutive interpretation is inappropriate for use in trial proceedings, or that the Court interpreters performed the interpretation method incorrectly. Simply put, Worthington was not prejudiced by the method of interpretation.

*Weight of the Evidence.* Worthington argues that the jury's verdict was against the weight of the evidence because Siewertsen cannot respond to audible warnings, which Worthington contends

is an essential function of the Shipper position.  After comparing the opposing proofs and weighing the record evidence, this Court cannot conclude the jury's findings were unreasonable, let alone against the weight of the evidence.  *See Conte*, 215 F.3d at 637.  As discussed above, the jury heard evidence that, among other things, Siewertsen operated forklifts and other motorized equipment throughout his ten-year tenure at Worthington, and he was employed full-time as a Shipper from March 2010 to January 2011.  The jury also heard testimony that in addition to horns, forklifts and C-hooks are equipped with lights and other warning signals, which allowed Siewertsen to safely navigate the coil fields.

This evidence was sufficient to allow a reasonable jury to conclude that audible communication is not an essential function of the Shipper position, and Siewertsen was a qualified employee under the meaning of the ADA.  The jury could have drawn different inferences or conclusions from the evidence presented, and perhaps a defense verdict also would have been reasonable.  The Sixth Circuit, however, clearly instructs that such circumstances are insufficient for relief under Federal Civil Rule 59(a).  *See J.C. Wyckoff & Assocs.*, 936 F.2d at 1487.

## CONCLUSION

Worthington's Motion for a New Trial (Doc. 192) and Motion for Judgment as a Matter of Law (Doc. 193) are denied.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

September 29, 2017